**PUBLISH**
**FOR THE TENTH CIRCUIT**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 26, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

In re: COX ENTERPRISES, INC. SET-TOP CABLE TELEVISION BOX ANTITRUST LITIGATION.

------------------------------

ANDREW ALWERT,

    Plaintiff - Appellant,

v.

COX COMMUNICATIONS, INC.,

    Defendant - Appellee.

_____

In re: COX ENTERPRISES, INC. SET-TOP CABLE TELEVISION BOX ANTITRUST LITIGATION,

------------------------------

STANLEY FELDMAN,

    Plaintiff - Appellant,

v.

COX COMMUNICATIONS, INC.,

    Defendant - Appellee.

_____

No. 15-6076

No. 15-6077

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 5:12-ML-02048-C)**
_____

Todd Schneider, Schneider Wallace Cottrell Konecky Wotkyns, L.L.P., San Francisco, California (Rachel Lawrence Mor, P.C., Oklahoma City, Oklahoma, Michael J. Blaschke, Michael J. Blaschke, P.C., Oklahoma City, Oklahoma, Allan Kanner and Cynthia St. Amant, Kanner & Whiteley, L.L.C., New Orleans, Louisiana, Jason Kim, Schneider Wallace Cottrell Konecky Wotkyns, L.L.P., San Francisco, California, Garrett W. Wotkyns, Schneider Wallace Cottrell Konecky Wotkyns, L.L.C., Scottsdale, Arizona, Joe R. Whatley, Jr., Whatley Kallas, LLP, New York, New York, Gregory P. Dileo, Gregory P. Dileo, APLC, New Orleans, Louisiana, Jeffrey P. Berniard, Berniard Law Firm, New Orleans, Louisiana, Joseph C. Peiffer, Peiffer Rosca Abdullah Carr & Kane, LLP, New Orleans, Louisiana, and John Dean Curtis, II, Burch & Cracchiolo PA, Phoenix, Arizona, with him on the briefs) for Plaintiffs-Appellants.

Alfred C. Pfeiffer, Jr., Latham & Watkins, LLP, San Francisco, California (Robert G. Kidwell, Mintz Levin Cohn Ferris Glovsky & Popeo, P.C., Washington, D.C., D. Kent Meyers, Crowe & Dunlevy, P.C., Oklahoma City, Oklahoma, Margaret M. Zwisler and Jennifer L. Giordano, Latham & Watkins, LLP, Washington, D.C., with him on the brief), for Defendant-Appellee.

_____

Before **HARTZ**, **PHILLIPS**, and **MORITZ**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Andrew Alwert and Stanley Feldman (Plaintiffs) brought putative class actions against Cox Communications, Inc. (Cox) claiming that it violated antitrust law by tying its premium cable service to rental of a set-top box. The district court granted Cox's motions to compel arbitration. It then certified the orders compelling arbitration for interlocutory appeal under 28 U.S.C. § 1292(b), and we granted Plaintiffs permission to appeal. They argue that the arbitration order is improper because (1) the dispute is not within the scope of the arbitration agreement, (2) Cox waived its right to invoke

2

arbitration, and (3) Cox's promise to arbitrate was illusory, so the arbitration agreement is unenforceable.  Exercising jurisdiction under 28 U.S.C. § 1292(b), we affirm.  We hold that the arbitration clause in Plaintiffs' subscriber agreements with Cox covers the present litigation and that Cox did not waive its right to arbitration.  We do not resolve Plaintiffs' argument that Cox's promises were illusory because the argument amounts to a challenge to the contract as a whole, which is a question to be decided in arbitration.

## I. BACKGROUND

### A. The Arbitration Agreement

Plaintiffs are Cox premium-cable subscribers who pay a monthly rental fee for the accompanying set-top box.  They also subscribe to Cox's high-speed Internet service and have the identical Internet-subscriber agreement.  Language in the second paragraph of the Introduction to the agreement gives Cox the right to modify it as it chooses:  "Cox reserves the right to modify the terms of this Agreement and prices for the Service . . . . Cox may discontinue or revise any or all other aspects of the Service, including features or enhancements, in its sole discretion at any time by posting changes online."  Joint App., Vol. II at 179 (Alwert), 255 (Feldman).  On November 18, 2011, Cox modified the agreements to add new dispute-resolution provisions that included an arbitration clause covering all Cox goods and services (not just Internet services).  The clause states:

> YOU AND COX AGREE TO ARBITRATE – RATHER THAN
> LITIGATE IN COURT – any and all claims or disputes between us
> (including any parents, subsidiaries, affiliates, officers, directors,
> employees, or agents of Cox) that arise out of or in any way relate to:
> (1) this Agreement; (2) services that Cox provides to you in connection
> with this Agreement; (3) products that Cox makes available to you; (4) bills
> that Cox sends to you or amounts that Cox charges you for services or

3

goods provided under this Agreement; and (5) any services or goods that Cox or any of its affiliated entities provide to you under any other agreement . . . .

*Id.* at 186 (Alwert), 262 (Feldman). The new language also includes a provision allowing a subscriber to opt out of the arbitration clause by sending notice to Cox within 30 days of receipt.[1] And it includes a class-action waiver and a choice-of-law provision stating: "This Agreement is governed by the laws of the state in which your billing address in our records is located, and applicable federal law." *Id.* at 186–87 (Alwert), 262–63 (Feldman). Because Cox did not mail notice of the modified agreement to Plaintiffs until March (Feldman) and April (Alwert) of 2012, Cox contends that the agreements did not take effect until April and May 2012. Plaintiffs make no argument disputing this analysis, so we adopt it. *See Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1227 (10th Cir. 2007).

## B. District Court Proceedings

In 2009 Cox subscribers in several jurisdictions filed putative class-action suits against Cox alleging illegal tying of its premium-cable service to rental of a set-top box. *See Gelder v. Coxcom Inc.*, 696 F.3d 966, 968 (10th Cir. 2012) (per curiam). Neither

---

[1] This opt-out provision states:

> You may opt out of this dispute resolution provision (except for the jury trial waiver . . . above) by notifying Cox of that intent within 30 days of receipt of this Agreement by sending a letter stating your intent to reject this dispute resolution provision to Cox . . . . Exercising this right, should you choose to do so, will not affect any of the other terms of this Agreement or other contracts with Cox and you may remain a Cox customer. If you opt out of the dispute resolution provision, you will not be required to do so again if Cox modifies this section in the future or you agree to a new term of service.

Joint App., Vol. II at 188 (Alwert), 264 (Feldman).

Plaintiff was a named party. These cases were consolidated and transferred to the United States District Court for the Western District of Oklahoma. *See id.* The subscribers sought to certify a national class. *See id.* But on December 28, 2011, the district court denied the request, *see id.*; and on August 8, 2012, we denied the subscribers' petition under Fed. R. Civ. P. 23(f) for permission to appeal the denial, *see id.* at 967–68.

Subscribers then filed putative class-action suits for several geographic regions. *See In re Cox Enterprises, Inc. Set-top Cable Television Box Antitrust Litig.*, 790 F.3d 1112, 1115 (10th Cir. 2015). Alwert filed his complaint on behalf of Cox subscribers in its New Orleans market on September 27, 2012; and Feldman filed his complaint on behalf of Cox subscribers in its Arizona market on October 15, 2012. The various regional actions were again consolidated and transferred to the Western District of Oklahoma. *See id.* The parties then agreed to stay all the cases except the one brought on behalf of Cox subscribers in its Oklahoma City market (the *Healy* litigation), which was to be litigated as a bellwether on the merits of the claims. *See id.* After the district court granted class certification in that case, Cox moved to compel arbitration. *See id.* The court denied the motion. Cox appealed and we affirmed. On August 11, 2014, while that appeal was pending, the district court lifted the stay on the cases before us. Cox answered both complaints on September 25. Eighteen days later, Plaintiffs submitted interrogatories and requests for production of documents. Three days later, on October 16, Cox, which had not sought discovery, moved to compel arbitration in both cases.

The district court granted the motions. It held that the arbitration clauses covered the present litigation, that Cox had not waived arbitration, and that the arbitration clauses were supported by consideration, not illusory promises by Cox.

## II.   DISCUSSION

### A.  Scope of Arbitration Agreement

"[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985); *see also AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986) ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.") Plaintiffs contend that their dispute with Cox concerning rental of cable-service set-top boxes does not come within the provision in the Internet-subscriber agreement to arbitrate "any and all claims or disputes between us . . . that arise out of or in any way relate to . . . (5) any services or goods that Cox or any of its affiliated entities provide to you under any other agreement." Because the district court's interpretation of the arbitration agreement's scope was founded on "an analysis of the [contractual] language . . . rather than upon the credibility of extrinsic evidence," our review of its decision is de novo. *Milk 'N' More, Inc. v. Beavert*, 963 F.2d 1342, 1345 (10th Cir. 1992) (internal quotation marks omitted); *see also O'Connor v. R.F. Lafferty & Co.*, 965 F.2d 893, 901 (10th Cir. 1992).

We begin with a strong presumption that the dispute is arbitrable. This presumption is not based on contract law but on the Federal Arbitration Act (FAA), 9

6

U.S.C. § 1 *et seq.* (1925), which creates the "federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). The FAA provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court has described this section as "a congressional declaration of a liberal federal policy favoring arbitration agreements." *Moses H. Cone*, 460 U.S. at 24. In particular, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Id.* at 24–25; *see United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582–83 (1960) ("An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."). "Thus, as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Mitsubishi Motors*, 473 U.S. at 626. "In the absence of any express provision excluding a particular grievance from arbitration, . . . only *the most forceful evidence* of a purpose to exclude the claim from arbitration can prevail . . . ." *Warrior & Gulf*, 363 U.S. at 584–85 (emphasis added).

This court has already construed language in a contract governed by the FAA that is indistinguishable in the relevant respects from language in the agreement before us. In

*Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 13 F.3d 330 (10th Cir. 1993), the plaintiff had purchased securities through the defendant 18 months before entering into an agreement providing that "any controversy between us *arising out of* your business or this agreement shall be submitted to arbitration." *Id.* at 331 (emphasis added). When the plaintiff filed a lawsuit in connection with his original securities purchase, the defendant moved to compel arbitration. *See id.* The district court found that the arbitration clause covered the dispute, and we affirmed. *See id.* at 332. Noting the presumption in favor of arbitration (though we also said that the arbitration language was "susceptible of only one reasonable interpretation"), we held that the agreement was "clearly broad enough to cover the dispute at issue despite the fact that the dealings giving rise to the dispute occurred prior to the execution of the agreement." *Id.* We rejected the argument that the agreement to arbitrate "must pre-date the actions giving rise to the dispute" as "contrary to contract principles which govern arbitration agreements." *Id.* The clause here is even broader because it covers disputes that "arise out of *or in any way relate to*" any Cox goods or services. Joint App., Vol. II at 186 (Alwert), 262 (Feldman) (emphasis added). Following *Zink*, we hold that the language of the arbitration agreement encompassed Plaintiffs' antitrust claim even though it arises out of events that predated the agreement. We interpret the arbitration agreement to require that for any dispute between Cox and a customer, each must henceforth seek resolution of the dispute through arbitration rather than filing suit.

The authority relied on by Plaintiffs does not persuade us to the contrary. In *Russell v. Citigroup, Inc.*, 748 F.3d 677 (6th Cir. 2014) the court held that an arbitration

agreement did not apply to litigation between the employee and employer that had commenced before the agreement was executed. The agreement covered "employment-related disputes . . . which . . . arise between" the employer and employee. In part the court based its conclusion on the language of the agreement. It said that "[t]he use of the present-tense 'arise' rather than the past-tense 'arose' or present-perfect 'have arisen,' suggests that the contract governs only disputes that begin—that arise—in the present or future. The present tense usually does not refer to the past." *Id.* at 679. This analysis has some force. But it cannot overcome our *Zink* precedent. What *Russell* says about *arise* could also be said about the word *arising* in *Zink* (*Russell* distinguished *have arisen*, not *arising*, from the word *arise*) and we said in *Zink* that the "only . . . reasonable interpretation" of the *arising* language was that it applied to a dispute predating the arbitration agreement. In any event, the agreement in *Russell* did not include the language "or in any way relate to" that appears in the agreement here. And the word *relate* does not have the same temporal connotation as *arise*; we can say that something arises at a particular point in time; but *relate* is broader and includes a relationship in subject matter that is independent of time.

There was, however, extrinsic evidence in *Russell* that could well be the sort of "forceful evidence" of the parties' intent that can overcome the presumption in favor of arbitrability: The plaintiff employee had already sued the defendant employer when he signed the arbitration agreement. *See id.* at 679. There was no evidence that either the plaintiff or the defendant had consulted with an attorney from that litigation before executing the arbitration agreement. *See id.* at 680. The circuit court, in our view quite

9

reasonably, thought that this failure by either party would be highly unlikely if they understood the agreement to cover the dispute being litigated. *See id.*

Plaintiffs argue that *Russell* is persuasive here because they were prospective plaintiffs in the putative national class action that had been filed before their arbitration agreements became effective. Although the district court had rejected class certification in December 2011, it was not until August 8, 2012 (after the effective dates of the arbitration agreements) that this court refused to consider an appeal from that denial. *See Gelder*, 696 F.3d at 966–68. Thus, Plaintiffs still had a chance to become plaintiffs in that lawsuit when they became bound by the arbitration clause. But prospective plaintiffs—that is, unnamed members of a putative class—are not parties to class litigation. *See Smith v. Bayer Corp.*, 131 S. Ct. 2368, 2379–80 (2011) (unnamed member of putative class was not a "party" to proceeding in which court denied class certification, and unnamed member is not precluded by any judgment in that litigation). And the great weight of authority, some of which we set out in a footnote, is that the attorneys in the putative class action do not represent them as class counsel. [2] Plaintiffs have cited nothing suggesting that the law of Louisiana or Arizona is otherwise.

---

[2] See *Sheinberg v. Sorensen*, 606 F.3d 130, 132 (3d Cir. 2010) ("[A] district court's decision to certify a class must precede the appointment of class counsel."); *Schick v. Berg*, 430 F.3d 112, 117 (2d Cir. 2005) (under Texas law, "[u]ntil a trial court determines that all prerequisites to certification are satisfied, there is no class action, the case proceeds as an ordinary lawsuit, and attorneys for named class members have no authority to represent or otherwise act on behalf of the unnamed class members" (internal quotation marks omitted)); *Hammond v. City of Junction City*, 126 F. App'x 886, 889 (10th Cir. 2005) (under the Kansas Rules of Professional Conduct, "there was no attorney-client relationship between the attorney and [a city employee with management duties who was a prospective class member] until the class was certified"); Restatement

10

Our case is therefore quite unlike *Russell*. In *Russell* the parties to the arbitration agreement were a single employee and a single employer who were already actively engaged in litigation when the arbitration agreement was executed. The *Russell* court, exercising common sense, could infer that the parties would surely have consulted their attorneys if they thought the arbitration agreement could possibly cover that litigation. No similar inference regarding Plaintiffs is possible here. Plaintiffs had no counsel with whom to confer; nor is there even any evidence that they thought they might have an antitrust claim against Cox when the arbitration agreement went into effect. We see no basis for an inference that Plaintiffs must have believed that the arbitration agreement did not encompass a dispute over set-top boxes because otherwise they would have consulted counsel. (Nor is there any reason to believe that Cox thought these cases would not be covered; on the contrary, it seems likely that Cox, which was facing set-top-box antitrust

---

(Third) of the Law Governing Lawyers § 99 cmt. l (Am. Law Inst. 2000) ("[A]ccording to the majority of decisions, once the proceeding has been certified as a class action, the members of the class are considered clients of the lawyer for the class; prior to certification, only those class members with whom the lawyer maintains a personal client-lawyer relationship are clients."); ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 07-445 (2007) ("A client-lawyer relationship with a potential member of the class does not begin until the class has been certified and the time for opting out by a potential member of the class has expired. If the client has neither a consensual relationship with the lawyer nor a legal substitute for consent, there is no representation. Therefore, putative class members are not represented parties for purposes of the Model Rules prior to certification of the class and the expiration of the opt-out period."); 2 McLaughlin on Class Actions § 11:1 n.1 (12th ed. 2015) (collecting cases); *but see id.* at nn.41 & 45 (citing two contrary cases).

claims, thought that future lawsuits on the subject *would* be covered by the arbitration

agreement.)[3]

---

[3] In the section of their brief entitled, "The District Court Erred in Finding That Cox's Arbitration Agreement Applied to Pre-Existing Class-Action Litigation," Plaintiffs also argue that "Cox's arbitration agreement should be interpreted to avoid raising highly problematic issues under Rule 23 and thus to not apply to any claim pre-existing the effective date of that agreement." Aplt. Br. at 19. They cite two cases in which courts said that defendants in putative class actions had improperly submitted arbitration agreements to putative class members. Plaintiffs do not claim, however, that the arbitration agreement (as interpreted by the district court) is unenforceable in whole or in part because of some problem under Rule 23, perhaps because they did not raise that argument below. Rather, they are saying that Rule 23 poses problems for the arbitration agreement and we should interpret the agreement to avoid having to resolve any such problems. This is an imaginative argument, a new one for us. Courts decide whether a contractual provision is enforceable or not; but Plaintiffs have not directed our attention to any authority, nor are we aware of any, suggesting that a court should construe contracts to avoid the need to resolve an enforceability issue. To be sure, a court may adopt an otherwise less attractive interpretation of a statute to avoid addressing a constitutional question, *see Commc'n Workers of Am. v. Beck*, 487 U.S. 735, 762 (1988); but the institutional reasons for avoiding constitutional questions hardly apply to questions of contract enforceability.

Moreover, we doubt whether Rule 23 suggests any limitation on the scope of the arbitration agreement. We recognize that courts can use Rule 23(d) to restrict inappropriate communications from counsel to putative class members. The Supreme Court stated in *Gulf Oil* Co. *v. Bernard*, 452 U.S. 89, 100–01(1981), "Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties," but such an order "should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties". *See* Fed. R. Civ. P. 23(d); Manual for Complex Litigation (Fourth) § 21.12, at 247 (2004) ("Rule 23(d) authorizes the court to regulate communications with potential class members, even before certification."). In this case, however, we are aware of no district-court findings or any order indicating that Cox had improperly submitted the arbitration agreement at issue. And we question whether there was any impropriety. When Cox submitted the arbitration agreement to Plaintiffs, the only filed antitrust case in which they were potential parties was moribund, awaiting a decision by this court whether even to consider an appeal from the district court's denial of class certification. In that situation, to require Cox either to refrain from submitting the arbitration agreement or to alert Plaintiffs that there may be subsequent class actions

12

At oral argument Plaintiffs argued that the arbitration clause should be construed against the drafter, Cox, and that the district court's ruling was contrary to the policy behind the Supreme Court's holding in *American Pipe and Construction Co. v. Utah*, 414 U.S. 538, 554 (1974), which said that the statute of limitations for putative class members is tolled during the pendency of a class action. But a contention first raised at oral argument is not properly preserved. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief.").

## B. Waiver

Plaintiffs also argue that Cox waived its right to arbitration. Our review of the district court's decision rejecting the waiver argument is de novo, except that we review the factual findings underlying the decision for clear error. *See In re Cox*, 790 F.3d at 1115–16.

We have recognized two forms of waiver. The first is based on a party's intent. A party can "subjectively" waive its right to arbitration if it intentionally relinquishes or abandons that right; once it has done so, it has no right to demand arbitration later. *See Hill v. Ricoh Americas Corp.*, 603 F.3d 766, 773 (10th Cir. 2010). Second, and much

---

in which they could become parties, would be breaking new ground. Plaintiffs have not presented any authority, or even argued, that a person proposing an arbitration agreement must alert the other contracting person about litigation that might be filed in the future that could come under the agreement. We need not decide whether failure to alert the other person about *pending* litigation may foreclose application of the arbitration agreement to that previously filed case, as in *In re Currency Conversion Fee Antitrust Litig.,* 361 F. Supp. 2d 237 (S.D.N.Y. 2005) and *Long v. Fid. Water Sys., Inc.,* No. C-97-20118 RMW, 2000 WL 989914 (N.D. Cal. May 26, 2000).

more commonly, a party's conduct in the course of litigation can foreclose it from the right to switch to arbitration, regardless of its intent. If it has proceeded too far in the litigation, so that switching to arbitration could create significant inefficiencies in the use of both the court and arbitrators or could prejudice opposing parties, we say that allowing the party to demand arbitration would be "improperly manipulating the judicial process." *Id.*; *see id.* at 773–75.

We have found it useful to examine the following six factors in assessing whether there has been a waiver of the right to arbitration:

> (1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether the litigation machinery has been substantially invoked and the parties were well into preparation of a lawsuit before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) whether important intervening steps (e.g., taking advantage of judicial discovery procedures not available in arbitration) had taken place; and (6) whether the delay affected, misled, or prejudiced the opposing party.

*Peterson v. Shearson/Am. Exp., Inc.*, 849 F.2d 464, 467–68 (10th Cir. 1988) (internal quotation marks omitted and brackets replaced by parentheses). The *Peterson* factors are not exclusive; the list "was not intended to suggest a mechanical process in which each factor is assessed and the side with the greater number of favorable factors prevails." *Hill*, 603 F.3d at 773. Rather, the analysis must be tethered to the fundamental reasons for finding waiver. *Id.*

"The burden of persuasion lies with the party claiming that the right to demand arbitration has been waived." *Id.* at 775; *Peterson*, 849 F.2d at 466 ("A party asserting a

14

waiver of arbitration has a heavy burden of proof."). We resolve any doubts in favor of arbitration. *See Moses H. Cone*, 460 U.S. at 24–25 (the presumption in favor of arbitration applies to "an allegation of *waiver*, delay, or a like defense to arbitrability" (emphasis added)); *Hill*, 603 F.3d at 775.

Applying the *Peterson* factors to Cox's conduct, we hold that it did not waive its right to arbitration. Regarding factor (1), its actions in these two cases were consistent with an intent to arbitrate: it moved to compel arbitration just three weeks after answering the complaints and three days after receiving discovery requests from Plaintiffs. Indeed, the district-court order granting Cox's motion to compel arbitration noted that the parties had anticipated Cox's seeking to enforce the arbitration agreement. Similarly, factors (2) and (3) do not support waiver because Cox initiated no discovery and moved to compel arbitration shortly after Plaintiffs made discovery requests, so it did not substantially invoke the litigation machinery or request enforcement of the arbitration agreement close to trial. Nor did Cox's answers to Plaintiffs' complaints include any counterclaims (factor (4)). As for factor (5), there were no "important intervening steps" other than filing answers in these two cases between the filing of suit and the arbitration demand, and even if we consider the *Healy* litigation, Plaintiffs have failed to point to any advantage that Cox would obtain over Plaintiffs in these two cases from the proceedings (including discovery) in *Healy*. Finally, Plaintiffs have failed to explain how they would have been better off if Cox had moved to compel arbitration earlier (factor (6)).

15

Plaintiffs invoke our waiver ruling in *Healy*, the bellwether case in the Cox multidistrict litigation, as support for waiver here. In *Healy* we agreed with the district court (1) that Cox's failure to inform the district court about the arbitration agreements until after class certification and its moving for summary judgment the same day it moved to compel arbitration were inconsistent with an intent to arbitrate, *see In re Cox*, 790 F.3d at 1117; (2) that Cox had substantially invoked the litigation machinery through numerous briefs and motions, including an appeal of class certification to this court, *see id.*; (3) that Cox did not move to compel arbitration until close to trial, *see id.*; (4) that the parties made ample use of discovery, which is more limited in arbitration, *see id.* at 1118; and (5) that not only did Healy suffer prejudice from Cox's delay because, among other things, it would be necessary to reexamine class certification if a large percentage of class members had to arbitrate their claims, but also the court was prejudiced by having spent judicial resources on the class-certification analysis and adjudication of motions and discovery disputes, *see id.* We therefore affirmed the district court's ruling that Cox had waived its right to compel arbitration. *See id.* at 1120–21.

The facts here are quite different. The district court (with the same judge as in *Healy*) said:

> While certainly there is some overlap in the nature of the claims, the cases are distinct. As Defendant notes, as a result of the agreed stay, there has been little if any work conducted in this case. Finally, none of the actions taken by Cox in the *Healy* case on which the Court based its finding of waiver have occurred in this case.

Joint App., Vol. IV at 651 (Feldman), 656 (Alwert).

16

As we understand Plaintiffs' briefs, they are basing their waiver argument on Cox's agreement to stay Plaintiffs' litigation while the *Healy* bellwether case proceeded. They seem to be contending that Cox had indicated its preference for litigation over arbitration by proceeding in court in *Healy*, but that Cox, now unhappy with adverse rulings in *Healy*, is seeking a new forum to resolve this related litigation without suffering any consequences of those rulings—thus prejudicing both Plaintiffs and the judicial process.

We reject Plaintiffs' argument. We fail to see how a party that has yet to begin litigating a pending claim can waive its right to arbitrate that dispute by having participated in earlier litigation of a distinct claim against a different party. With respect to subjective waiver, people frequently change their minds after a negative experience. The fact that a party wants to litigate one case does not mean that it will want to litigate a future case if its litigation experience convinces it that arbitration would be preferable. In any event, Plaintiffs have not argued such subjective waiver by Cox, and the record would not support it.

As for waiver by conduct, a party cannot be said to manipulate the judicial process by seeking to arbitrate a claim unless the party has litigated the same claim. If the present claim has not been litigated, the parties are still going to have to go to some forum—arbitration or litigation—to resolve it. And if the party now seeking arbitration has done nothing in the earlier litigation beyond what was appropriate in that litigation, its conduct in that litigation could hardly be an improper imposition on the court or opposing parties in the pending dispute. Whatever happened in the other litigation was going to happen

17

regardless of whether the pending claim is arbitrated or litigated.  In short, the party seeking arbitration cannot be accused of imposing a burden on the court or opposing parties by seeking arbitration of the present claim after litigating a different claim earlier.

Thus, the circuits to address the issue have said that waiver cannot be based on prior litigation unless the litigation was between the same parties and involved essentially the same claim as the one to be arbitrated.  *See Doctor's Associates, Inc. v. Distajo*, 107 F.3d 126, 132–34 (2d Cir. 1997); *Microstrategy Inc. v.  Lauricia*, 268 F.3d 244, 250 (4th Cir. 2001); *Subway Equipment Leasing Corp. v.  Forte*, 169 F.3d 324, 328–29 (5th Cir. 1999); *see also Grumhaus v.  Comerica Securities, Inc*., 223 F.3d 648, 652 (7th Cir. 2000) ("We agree that different claims may arise from a common factual basis, and that in one claim, a party may wish to waive arbitration while preserving that right in the other.  [But] when the same issues are presented, a party may not escape the effect of its waiver by minimally restyling the claim and presenting it for arbitration.")

Agreeing with those circuits, we hold that there was no waiver here.  First, the claim in *Healy* is not the same as Plaintiffs' claims.  The three cases alleged antitrust violations in three different markets: *Healy* in Oklahoma, *Alwert* in Louisiana, and *Feldman* in Arizona.  The very reason the district court rejected a national class to challenge Cox's conduct was that the different markets raised different factual issues. Second, the parties are different.  Plaintiffs are not parties in *Healy*.  The difference in parties is dispositive.  In *Doctor's Associates* the court "easily dispose[d]" of the claim that a party had waived its right to arbitrate claims against a party that it had not litigated against; it noted its prior decision that a party "obviously had not waived its right to

18

arbitrate claims brought by franchisees against whom [the party] had never instituted [litigation]." 107 F.3d at 132 (internal quotation marks omitted).

Plaintiffs offer only one case to support their claim that Cox waived its right to arbitrate in this case by participating in the *Healy* litigation: *PPG Indus., Inc. v. Webster Auto Parts, Inc.*, 128 F.3d 103 (2d Cir. 1997). But that decision concerned two cases consolidated before the same court that involved the same parties and, for the most part, the same claims. Further, the court noted that in Case 1 the party seeking arbitration of Case 2 had pursued discovery relevant only to a claim in Case 2 that was not presented in Case 1. *Id.* at 108–09. We note that *PPG* was decided by the same court that decided *Doctor's Associates* and in no way suggested any criticism of its earlier decision.

We recognize that Plaintiffs' suits and *Healy* were consolidated in part for multidistrict litigation. But "[c]ases consolidated for MDL pretrial proceedings ordinarily retain their separate identities." *Gelboim v. Bank of Am. Corp.*, 135 S. Ct. 897, 904 (2015) (dismissal order was final, appealable judgment despite pendency of other cases in the MDL).[4] Consolidation does not "meld [one] action and others in the MDL into a single unit." *Id.* at 905. Plaintiffs have not pointed to anything relevant to waiver that would distinguish the situation before us from one with no MDL consolidation.

---

[4] *Gelboim* recognized, however, that some cases (unlike the ones before us) may lose their separate identities in MDL pretrial proceedings. *See* 135 S. Ct. 897 at 904 n.3. If the parties "elect to file a 'master complaint' and a corresponding 'consolidated answer,' which supersede prior individual pleadings . . . , the transferee court may treat the master pleadings as merging the discrete actions for the duration of the MDL pretrial proceedings." *Id.* There is no merger, however, if these pleadings are not meant to have legal effect but serve only administrative convenience by summarizing the claims of all plaintiffs. *See id.*

We recognize that Plaintiffs alleged that permitting arbitration would prejudice them in three ways: (1) during the stay, while the bellwether litigation in *Healy* continued, Cox was able to learn about Plaintiffs' theories by obtaining discovery in the *Healy* litigation from the same experts that Plaintiffs would use in these cases; (2) if Plaintiffs had known that Cox would later try to arbitrate the claims, they would not have agreed to the stay but would have pursued their claims through arbitration; and (3) by staying these cases during *Healy*, Cox could wait to see what the rulings would be in that litigation and then decide whether litigation or arbitration would be more advantageous to Cox in Plaintiffs' cases. We are not persuaded that Plaintiffs were prejudiced in these respects. They benefited at least as much as Cox by the *Healy* discovery (which did not include any discovery from Plaintiffs). They have presented nothing to suggest that they would have wished to arbitrate their claims sooner if they had thought that arbitration would be demanded by Cox later. And the whole purpose of bellwether litigation, such as *Healy*, is to enable other litigants to learn from the experience and reassess their tactics and strategy (and, hopefully, settle).[5] To complain that an opposing party made an

---

[5] *See Manual for Complex Litigation (Fourth)* § 22.315, at 360 (2004) ("[Bellwether] cases should produce a sufficient number of representative verdicts and settlements to enable the parties and the court to determine the nature and strength of the claims, whether they can be fairly developed and litigated on a group basis[,] and what range of values the cases may have if resolution is attempted on a group basis."); Eldon E. Fallon, Jeremy T. Grabill, & Robert Pitard Wynne, *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2338 (2008) ("First, bellwether trials allow coordinating counsel to hone their presentation for subsequent trials and can lead to the development of 'trial packages' for use by local counsel upon the dissolution of MDLs. Second, and perhaps more importantly, bellwether trials can precipitate and inform settlement negotiations by indicating future trends, that is, by providing guidance on how similar claims may fare before subsequent juries."); Duke Law Ctr. for Judicial Studies, *Standards and Best*

unwelcome decision based on bellwether litigation (surely the Plaintiffs could *increase* their settlement demands) is to attack the bellwether process itself.

In any event, the prejudice claimed by Plaintiffs is not the type of prejudice that we consider in assessing whether a party has waived by conduct its right to demand arbitration. As stated in *Doctor's Associates*, 107 F.3d at 134, "[P]rejudice . . . refers to the inherent unfairness—in terms of delay, expense, or damage to a party's legal position—that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue." *Accord Subway Equipment*, 169 F.3d at 327. Cox is seeking to arbitrate the claims raised against it by Plaintiffs, which have not previously been litigated.

We agree with the district court that Cox has not waived its right to demand arbitration against Plaintiffs.

### C. Illusory Contract

The FAA provides that arbitration agreements "shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract*." 9 U.S.C. § 2 (emphasis added). Plaintiffs contend that Cox's arbitration clause is not enforceable because Cox's promises under the clause are illusory. They rely on language in the introduction of their Internet-subscriber agreement:

> *Cox reserves the right to modify the terms of this Agreement and prices for the Service . . . .* Cox may discontinue or *revise any or all other aspects of*

*Practices for Large and Mass-Tort MDLs*, 21 (2014) ("Bellwether trials may provide useful information to the parties regarding the likely outcome of other cases at trial, such as: (a) how well or poorly the parties' fact and expert witnesses perform in a trial setting; and (b) decisions on key legal issues and the admissibility of key evidence.").

21

> *the Service . . . in its sole discretion at any time by posting changes online.* Your continued use of the Service after changes are posted constitutes your acceptance of this Agreement as modified by the posted changes. The updated, online version of this Agreement shall supersede any prior version of this Agreement . . . .

Joint App., Vol. II at 179 (Alwert), 255 (Feldman) (emphasis added). The term "Agreement" refers to the Internet-subscriber agreement as a whole. *See id.* Plaintiffs construe this language to mean that Cox may modify the Agreement's terms at any time. And because its terms include the arbitration clause, that clause may also be unilaterally modified at any time. Plaintiffs argue that this right to modify makes the arbitration clause unenforceable.

Plaintiffs may be correct. But that is an issue for the arbitrator, not the district court or this court. As we will explain more fully below: (1) Under the FAA, unless the arbitration provision states otherwise, the question of the enforceability of a contract as a whole is a matter for the arbitrator. Only if an enforceability argument applies only specifically to the arbitration provision (such as a claim that the provision is unconscionable or that a party was defrauded into agreeing to the arbitration provision) is enforceability to be decided by the court. (2) Although Plaintiffs frame their "illusory" argument as directed at the arbitration provision of the Internet-service agreement, general contract law does not permit such an argument on a provision-by-provision basis. This proposition follows once one understands the basis of an "illusory" argument. An illusory promise is not a real promise, although it may appear to be one. Whereas a real promise can be consideration for a contract, an illusory promise cannot. If all the consideration given by one party to a contract consists of illusory promises, then the party

22

has provided no consideration and cannot enforce the contract. But an illusory promise in just one provision does not make the contract unenforceable. Consideration may appear in a separate provision. Therefore, Plaintiffs must show that nowhere in the service agreement has Cox provided consideration, and that showing goes to the enforceability of the contract as a whole. (3) General contract law may not apply here if the law of Arizona (for Feldman) or Louisiana (for Alwert) does not follow that law. It is conceivable that a state's contract law could require consideration in each provision of the contract. But Plaintiffs have not shown that to be the case. We now turn to each of these three matters.

First, almost 50 years ago the Supreme Court held that the arbitrator, not a court, should determine whether a contract including an arbitration provision is enforceable. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967). Prima Paint had contracted to purchase the paint business of Flood & Conklin (F&C). *See id.* at 397. The contract had an arbitration clause. *See id.* at 398. Shortly after Prima Paint's first payment was due, it complained that F&C had falsely represented that it was solvent and asserted that F&C had breached the contract. *See id.* F&C served a notice of intent to arbitrate and Prima Paint filed suit to rescind the contract for fraudulent inducement. *See id.* F&C moved to stay the action pending arbitration. *See id.* at 399. It argued that "the issue presented—whether there was fraud in the inducement of the consulting agreement—was a question for the arbitrators and not for the District Court." *See id.* The district court agreed, and so did the Supreme Court. The Supreme Court held that the issue of arbitrability was resolved by § 4 of the FAA, which provides that a court

23

shall order arbitration after determining that "the making of the agreement for arbitration or the failure to comply with the arbitration agreement is not in issue." *Id.* at 403 (brackets and internal quotation marks omitted). Thus, it said, "if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally." *Id.* at 403–04 (footnote omitted). "[I]n passing upon [an] application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate." *Id.* at 404. Because the plaintiff had claimed fraudulent inducement of the entire contract rather than only the arbitration agreement, arbitration of the dispute was required. *See id.* at 406–07.

*Prima Paint* was recently endorsed in *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006). The plaintiffs had entered into contracts under which they received cash in exchange for a personal check made out for the amount of the cash plus a finance charge. *See id.* at 442. They brought a class action in Florida state court, arguing that because the contract violated state lending and consumer-protection laws, it was void for illegality. *See id.* at 443. Invoking the contract's arbitration clause, the defendant moved to compel arbitration. *See id.* But the state supreme court held that because the contract was unlawful the arbitration provision could not be enforced. *See id.* The United States Supreme Court reversed. Holding that *Prima Paint*'s rule applies to state-court proceedings, the Court reaffirmed that "a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." *Id.* at 449.

24

Of particular importance in this circuit, the Court distinguished, without endorsing, our decision in *Spahr v. Secco*, 330 F.3d 1266 (10th Cir. 2003), in which we departed from *Prima Paint*. In that opinion we held that, despite *Prima Paint*, a court can refuse to enforce an arbitration clause in a contract if the contract as a whole is unenforceable because of mental incapacity of a party. *See id.* at 1273. *Buckeye* treated *Spahr* as addressing not whether an agreement was enforceable, but "whether any agreement between the alleged obligor and obligee was ever concluded." 546 U.S. at 444 n.1 (citing *Spahr* and opinions involving "whether the alleged obligor ever signed the contract" or "whether the signor lacked authority to commit the alleged principal").

We now must consider whether Plaintiffs' "illusory" argument challenges just the arbitration provision of the Internet-service agreement or the entire agreement. We hold that it is a challenge to the entire agreement, because the arbitration provision would be unenforceable only if the entire agreement is unenforceable. As the Restatement (Second) of Contracts explains, the notion of an illusory promise is simply part of the doctrine of consideration. "Words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise. . . . Where the apparent assurance of performance is illusory, it is not consideration for a return promise." Restatement (Second) of Contracts §77 cmt. a (Am. Law Inst. 1981); *see Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 315 (6th Cir. 2000) ("[A] promise may in effect promise nothing at all. Such an illusory promise arises when a promisor retains the right to decide whether or not to perform the promised act."). It is important to keep in mind, however, that a contract may be supported by adequate consideration, and hence be

25

enforceable, even if one of the promises by a party is illusory. If that party provides other consideration, such as a nonillusory promise, the fact that one promise is illusory is immaterial. That consideration may appear in a totally distinct provision of the contract as a whole. "A single performance or return promise may . . . furnish consideration for any number of promises." Restatement (Second) of Contracts § 80 cmt. a; *see id.* § 80(1) ("There is consideration for a set of promises if what is bargained for and given in exchange would have been consideration for each promise in the set if exchanged for that promise alone."); *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1182 (9th Cir. 2015) ("[T]he law does not require every term of the contract to have a separately stated consideration."). In particular, "where the agreement to arbitrate is integrated into a larger unitary contract, the consideration for the contract as a whole covers the arbitration clause as well." *Doctor's Associates, Inc. v. Distajo*, 66 F.3d 438, 453 (2d Cir. 1995) (internal quotation marks omitted) (applying Connecticut law). Further, it is undeniable that Plaintiffs' "illusory" argument attacks the entire Internet-service agreement, rather than just the arbitration provisions, because the argument is based on language outside those provisions. It is in the "Introduction" to the agreement that we find the language "Cox reserves the right to modify the terms of this Agreement and prices for the Service . . . [and] Cox may discontinue or revise any or all other aspects of the Service… in its sole discretion at any time by posting changes online." Joint App. Vol. II at 179 (Alwert), 255 (Feldman).

We therefore conclude that Plaintiffs' "illusory" argument, which can prevail only as an attack on the Internet-service agreement as a whole, must be resolved by the

26

arbitrator. *See Lawrence v. Comprehensive Bus. Servs. Co.*, 833 F.2d 1159, 1164 (5th Cir. 1987) ("Whatever inequalities exist [in the contract] could only establish non-mutuality of obligation in the contract as a whole, not in the arbitration clause. And *Prima Paint* requires that disputes concerning the contract, as opposed to the making of the arbitration clause, be referred to the arbitrator.").

We recognize that this court has previously resolved whether an arbitration agreement was unenforceable because one party's promise was illusory. *See Hardin v. First Cash Fin. Servs.*, Inc., 465 F.3d 470 (10th Cir. 2006) (reversing denial of motion to compel arbitration) and *Dumais v. American Golf Corp.*, 299 F.3d 1216 (10th Cir. 2002) (upholding denial of motion to compel arbitration). But in *Hardin* it appears that the only contract at issue was a distinct contract to arbitrate, so what we did was fully consistent with *Prima Paint*. And neither opinion considered, or even cited, *Prima Paint* or *Buckeye* (which postdated *Dumais*). An opinion is not binding precedent on an issue not addressed in the opinion. *See Planned Parenthood of Kansas & Mid-Missouri v. Moser*, 747 F.3d 814, 830–35 (10th Cir. 2014) (distinguishing precedents which do not consider the disputed issue). Therefore, we are free to follow the clear commands of the Supreme Court and leave to the arbitrator to resolve Plaintiffs' "illusory" argument.

This leaves just one loose end to tie up. In addressing the law regarding illusory promises, we have relied on widely accepted principles of contract law. But Feldman's contract is governed by Arizona law and Alwert's by Louisiana law. What if Arizona or Louisiana has not followed those principles? When the FAA states that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist

27

at law or in equity for the revocation of any contract," 9 U.S.C. § 2, it is referring to the law of the state that governs the contract, *see Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987). It is possible that under the law of Arizona or Louisiana each provision of a contract must be supported by consideration expressed in that provision. If so, then Plaintiffs' "illusory" argument *could* apply to the arbitration agreement alone and this court would not be precluded by *Prima Paint* from addressing the argument. Plaintiffs have not shown, however, that in either state the relevant general contract law requires a different result. We first address Arizona before turning to Louisiana.

At first blush, Arizona law may appear to be nonstandard. An Arizona appellate decision states that an *arbitration* clause must be supported by consideration independent of the consideration supporting the contract as a whole. *See Stevens/Leinweber/Sullens, Inc. v. Holm Dev. & Mgmt., Inc.*, 795 P.2d 1308, 1313 (Ariz. Ct. App. 1990) ("Because . . . the arbitration provision is an independent and separate agreement, [the defendant] cannot 'borrow' consideration from the principal contract to support the arbitration provision."). But that opinion does not purport to state a general rule of contract law, only a rule applicable to arbitration clauses. (It appears to have relied on a misreading of *Prima Paint*, but the source of its ruling is irrelevant for our purposes.) Such arbitration-specific law is not the sort of *general* state law applicable under 9 U.S.C. § 2 of the FAA. As stated in *Perry*:

> A state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with . . . § 2. A court may not . . . in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law.

28

> Nor may a court rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable, for this would enable the court to effect what we hold today the state legislature cannot.

482 U.S. at 492 n.9 (citations omitted); *see Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) ("Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed upon the same footing as other contracts."); *Southland Corp. v. Keating*, 465 U.S. 1, 16 n.11 (1984) (rejecting application of California Franchise Investment Law that barred enforcement of an arbitration agreement because the statute is "not a ground that exists at law or in equity 'for the revocation of *any* contract' but merely a ground that exists for the revocation of arbitration provisions"). Thus, a federal district court in Arizona correctly refused to follow *Stevens*. In *Diversified Roofing Corp. v. Pulte Home Corp.*, No. CV12-1880 PHX DGC, 2012 WL 6628962, at *4 (D. Ariz. Dec. 19, 2012), the plaintiff argued that Arizona law required separate consideration to support an arbitration clause. But the court held that *Stevens* was inapplicable "because the FAA applies state law only to the extent that it is not hostile to arbitration." *Id.* (brackets and internal quotation mark omitted).[6]

---

[6] Feldman's reliance on *Coup v. Scottsdale Plaza Resort, LLC*, 823 F. Supp. 2d 931, 950 (D. Ariz. 2011), is misplaced. In that case the magistrate judge ordered arbitration. *See id.* at 955. And the court recognized that "so long as a contract is supported by sufficient consideration there is no requirement of equivalent promises or mutuality of obligation." *Id.* at 951 (internal quotation marks omitted). It cited *Stevens* only for the proposition that Arizona will ordinarily follow the Restatement (Second) of Contracts; and we are not persuaded by any dictum in the opinion that might be read to adopt *Stevens*' departure from the Restatement as a matter of general contract law.

29

As for Louisiana, it follows civil law, *see Duckworth v. La. Farm Bureau Mut. Ins. Co.*, 125 So. 3d 1057, 1064 (La. 2012), which does not incorporate the notion of consideration, *see Aaron & Turner, L.L.C. v. Perret*, 22 So. 3d 910, 915 (La. Ct. App. 2009) ("Louisiana does not follow the common law tradition that requires consideration to effect an enforceable contract. Rather, the mere will of the parties will bind them, without what a common law court would consider to be consideration to support a contract, so long as the parties have a lawful 'cause.'"). Alwert nevertheless relies on *Simpson v. Grimes*, 849 So. 2d 740 (La. Ct. App. 2003), to argue that the arbitration clause is unenforceable. The plaintiffs in *Simpson* sued to recover losses to an individual retirement account (IRA) based on an alleged breach of fiduciary duty, among other claims. *See id.* at 742. The defendants invoked the arbitration clause in the IRA application. *See id.* But the court of appeals held that it was unenforceable because the defendants had retained the unilateral right to modify the agreement and thereby created an "escape hatch" from its promise to be bound to arbitrate disputes. *Id.* at 748. The court concluded that the defendants' right to modify resulted in a lack of mutuality, rendering the agreement unconscionable and unenforceable. *See id.* at 749.

But to the extent that *Simpson* held that a unilateral right to modify made an arbitration clause unenforceable, it was subsequently overruled by the Louisiana Supreme Court in *Aguillard v. Auction Mgmt. Corp.*, 908 So. 2d 1 (La. 2005), which granted certiorari to resolve a split in Louisiana's lower courts (specifically mentioning *Simpson*) "regarding the enforceability of arbitration agreements in consumer standard form contracts under a 'contract of adhesion' analysis," *id.* at 7. The *Aguillard* plaintiff

30

entered into a contract with an auctioneer that provided the auction's terms and conditions. *See id.* at 4. The contract contained an arbitration clause as well as a provision stating that "[a]ll announcements from the Auction Block will take precedence over all previously printed materials and other oral statements made." *Id.* The court of appeals had held that this provision gave the auctioneer "the unilateral power to change any or all parts of the contract, including the arbitration clause, simply by verbal announcement at the auction block," making the arbitration clause unenforceable because it was adhesionary and lacking in mutuality. *Id.* at 16. But the Louisiana Supreme Court held that the arbitration clause was enforceable. *See id.* at 17. We need not review the particulars of Louisiana law on which the court relied. The essential point is that the unilateral power to revise the contract did not make the arbitration provisions unenforceable.

Plaintiffs argue that "[t]here is no indication in *Aguillard* that the Louisiana Supreme Court would validate an arbitration provision that truly lacked mutuality because one party maintained the unilateral right to modify it at will." Aplt. Br. at 21 n.6. But to the contrary, the *Aguillard* court recognized that the contract provided the defendant with a unilateral right to modify it via announcements from the auction block. *See* 908 So. 2d at 17 ("the terms . . . provided the defendants with the right to make announcements from the Auction Block that would take precedence over all previously printed materials"). Perhaps the court left open the possibility that an arbitration provision in a contract containing a clause giving one party the unilateral right to modify could be unenforceable if there are other circumstances that would indicate

31

unconscionability. *See id.* But Plaintiffs, rather than confronting *Aguillard*'s holding and trying to distinguish the facts here, simply misstate that holding. Because the issue was not briefed, we need not address whether such other circumstances are present here. *See Bronson*, 500 F.3d at 1104.

## III. CONCLUSION

We AFFIRM the district court's orders compelling arbitration.